IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

MIGUEL CLAUDIO TREVINO,

Defendant.

CRIMINAL ACTION NO.
1:13-CR-324-SCJ-LTW

## MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION AND ORDER CERTIFYING THIS CASE READY FOR TRIAL

Pending before this Court is Defendant Miguel Trevino's Motion Suppress Statements and Motion to Suppress Physical Evidence and Statements. Docket Entries [49, 75]. This Court convened a suppression hearing with respect to Defendants Motions on February 6, 2014. Docket Entry [89]. Defendant filed several requests for extensions of time to file his post-hearing brief in support of his motion to suppress. Docket Entries [90, 93, 96, and 102]. On August 4, 2014, Defendant filed his post-hearing brief. Docket Entry [112]. The Government filed its response to Defendant's post-hearing brief on August 25, 2014. Docket Entry [121]. Thereafter, Defendant requested and was granted an extension of time until November 23, 2014, to reply to the Government's response to Defendant's post-hearing brief. On November 25, 2014, Defendant informed the Court that he would not be filing a Reply. Accordingly this case

is ripe for a ruling.  For the reasons set forth below, Defendant's Motion to Suppress Statements and Motion to Suppress Physical Evidence and Statements should be **DENIED**.  [Docket Entries 49, 75].

## DEFENDANT'S MOTION TO SUPPRESS EVIDENCE AND STATEMENTS

## I.   FACTUAL BACKGROUND

On August 13, 2013, the grand jury returned an indictment charging Defendant Miguel Claudio Trevino, along with two co-defendants, with one count of conspiracy to possess with intent to distribute cocaine, in violation of 21 U.S.C. §§ 846, 841(b)(1)(C), and one count of possession with intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C)(ii).  Docket Entry [30].  In seeking to suppress physical evidence and statements made, Defendant argues the traffic stop, detention, and seizure of evidence from the vehicle in which he was a passenger was illegal, and any statements he made thereafter are inadmissible.

On July 24, 2013, Task Force Officer ("TFO") Christo Carlisle[1] was conducting surveillance at the Red Roof Inn in Atlanta, Georgia.  (Transcript of Feb. 6, 2014 Evidentiary Hrg., hereinafter "Tr.," 7, 9).  TFO Carlisle and other law enforcement officers had information that someone at or near the Red Roof Inn was involved in

---

[1] TFO Carlisle was employed by the Georgia State Patrol, assigned to the criminal interdiction unit, and also loaned out for assistance for two years to the U.S. Department of Homeland Security or Immigration and Customs Enforcement ("ICE"). (Tr. 7).  Additionally, TFO Carlisle has been employed with the Georgia State Patrol for sixteen years, and has conducted several thousand traffic stops, and [has issued] hundreds of warnings and citations.  (Tr. 9).

2

narcotics, possibly involving money going back toward the border of Mexico. (Tr. 9-10). According to TFO Carlisle, the Red Roof Inn is located in a high crime area, known not only for drugs, but other crimes as well. (Tr. 10). Within a few seconds of pulling into the REd Roof Inn parking lot, Officer Carlisle observed a gray F-150 pickup truck with a Texas license plate on the front of the truck. (Tr. 10). TFO Carlisle checked the vehicle's registration and discovered it was registered in Hidalgo, one of the cities very close to the Mexico border. (Id.). While driving around the hotel, TFO Carlisle saw two gentlemen come out of the hotel, enter the pickup truck, pull out of the parking lot, and make a left turn onto Druid Hills. (Tr. 10, 19). Law enforcement officers following the F-150 truck observed that the truck stopped at a red light, turned left onto Buford Highway, and then immediately pulled into a coin laundry. (Tr. 11). TFO Carlisle also followed the truck onto Buford Highway, passed it, and turned into a place which was at a higher point in order to keep an eye on the truck. (Id.). TFO Carlisle observed that no one got out of the truck, instead the occupants just sat there in the truck. (Id.). A few minutes later, the F-150 truck left the parking lot, headed north on Buford Highway, only to pull into a Kroger parking lot. (Tr. 11-12). Again, no one exited the truck, and the truck stayed a couple of minutes in the Kroger parking lot, pulled out, and then proceeded back up Buford Highway. (Tr. 12). TFO Carlisle and other agents communicating by radio continued to follow the truck. (Tr. 13-15). Based on TFO Carlisle's training and experience, TFO Carlisle thought the occupants of the truck were conducting "heat checks," meaning they checking for the presence of law

3

enforcement or any kind of robbery crew that may be trailing them.  (Tr. 11-12, 14).

Eventually, the truck went to another hotel, a Holiday Inn on Clairmont Road. (Tr. 15-16).  TFO Carlisle, driving a black Dodge Charger, passed the F-150 truck while another agent pulled into the Holiday Inn parking lot where the agent was able to keep an eye on the truck and its two occupants.  (Tr. 16, 19).  After the truck pulled into the parking lot, the driver stayed in the truck, and the passenger exited the truck and walked into the Holiday Inn carrying a small bag.  (Tr. 16).  The agent who followed the truck into the parking lot, took a picture of the passenger who got out of the truck, and sent the picture to other agents.  (Tr. 17, Gov't Ex. 1).  Within a few minutes, the passenger returned to the truck with a different bag, a roller bag, similar to a suitcase that one would take the airport.  (Id.).  The passenger, later identified as the Defendant, was wearing a red-and-white striped shirt.  (Tr. 18, 21; Gov't Exs. 1, 3).

The driver of the truck, later identified as co-defendant Roberto Isidoro Vera ("Vera"), pulled out of the Holiday Inn parking lot, went down Clairmont Road toward a body shop on Dresden Road, and made several turns, including several u-turns along the way.  (Tr. 20, 23).  After initially losing visual contact with the truck, the agents found the truck and its occupants at a body shop.  (Tr. 20-21).  TFO Carlisle and Agent Escheverry went next door to an AT&T building near the body shop to maintain visual surveillance of the F-150 truck and its occupants.  (Tr. 21).  After traveling to the backside of AT&T's property, TFO saw the Defendant in a red-and-white stripe shirt standing near the F-150 pickup, along with a couple of workers from the body shop.

4

(Id.).  Because the AT&T parking lot was located at a place higher than the body shop, TFO Carlisle and Agent Echeverry were able to observe the roller bag which was still in the back of the gray F-150 truck.  (Id.).

Later, a white pickup truck with blue letters that spelled "Finney" on the side arrived and the roller bag was transferred from the gray F-150 pickup while Defendant and Vera's were present.  (Tr. 23, 58).  Shortly thereafter, a red Nissan Maxima pulled up and Vera got into the Maxima with another gentlemen.  (Id.).  The red Maxima and its occupants left the body shop for a few minutes, and when it returned, the Maxima backed up near the white Finney truck.  (Id.).  The roller bag and several other bags were transferred from the white Finney truck to the red Maxima.  (Id.).  As the white Finney truck and the red Maxima were leaving the body shop in tandem, the agents observed that Vera was in the driver's seat of the red Maxima and Defendant was in the passenger's seat.  (Tr. 24).

TFO Carlisle pulled out of the AT&T parking lot and followed the vehicles which were still traveling in tandem.  (Id.).  After traveling down Shallowford Road, the white Finney truck got into the far left lane to turn onto Interstate 85 North.  (Tr. 24).  The red Maxima stopped in the right lane, appeared to be unsure of which way to go or where he was going, cut across four lanes of traffic without using a turn signal, and followed the white Finney truck onto Interstate-85 North.  (Tr. 25-26).  TFO Carl continued to follow both vehicles and observed that the red Maxima was following very, very close to the white Finney truck and was traveling over the posted speed limit.  (Tr. 27).  The

5

white Finney truck moved to the right lane and decreased his speed leaving TFO Carlisle's car directly behind the red Maxima.  (Id.).

While TFO Carlisle was behind the red Maxima, the white Finney truck swerved and tried to cut back in between TFO Carlisle's car and the red Maxima.  (Tr. 28-29). Based on his experience in conducting traffic stops in drug cases, TFO testified that he has had his vehicle rammed by drug cartel members in "follow cars."  (Tr. 28).  At this point, TFO Carlisle activated his blue lights, flashing headlights, grille lights, fog lights, and siren to signal the red Maxima to pull over.  (Tr. 29).  When TFO Carlisle's blue lights came on, the white Finney truck, with its left signal light on, cut across every lane on Interstate 85, and turned onto Interstate 285 at the last second.  (Tr. 30).  TFO Carlisle did not follow or pursue the white Finney truck.  (Id.).  Instead, TFO Carlisle stayed behind the Maxima which did not immediately pull over, but maintained its speed and traveled approximately a mile and a half to two miles before pulling over onto the right shoulder of Interstate 85.  (Id.).

TFO Carlisle, wearing his uniform, pulled behind the red Maxima at 11:52 a.m., approached Vera on the driver's side, and asked for his driver's license.  (Tr. 30, 32, 61). No guns were drawn and TFO Carlisle was not yelling.  (Tr. 30).  After Vera gave TFO Carlisle a Texas driver's license, TFO Carlisle asked Vera to step to the back of the car so that he could speak with him.  (Tr. 30).  TFO Carlisle explained his reasons for pulling Vera over, which were failure to use his turn signal after crossing four lanes, speeding, following too close on the interstate, and failure to yield to an emergency

6

vehicle.  (Tr. 31, 62; Gov't. Ex. 4).   TFO Carlisle asked Vera who owned the red Maxima he was driving, and Vera replied that he did not know the identity of the owner. (Tr. 31).  Vera stated that he and the Defendant, an old friend, had just gotten into town [from Texas] the day before, but they did not have a reason to be in Atlanta.  (Tr. 32). Vera did not know many facts about Defendant and could not say if he and Defendant were in Atlanta for business or pleasure; however, Vera did say that they were enroute to pick up car parts for his F-150 truck.  (Id.).  Vera also said his truck broke down and that is why they took it to the mechanic shop, and that the shop loaned him the Maxima to go get brake parts or some kind of parts for the F-150.  (Id.).

TFO Carlisle went to the passenger side of the Maxima and asked Defendant for his identification and his reason for being in Atlanta.  (Tr. 33).  Defendant did not provide a reason why he and Vera were in Atlanta and did not know the owner of the vehicle.  (Tr. 33-34).  In contrast to Vera, Defendant stated that he and Vera were on their way to get lunch, and did not mention anything about going to get car parts.  (Tr. 46).  Defendant was also asked what kind of work he did, and Defendant replied that he did not have a job or any source of income.  (Tr. 34).  TFO Carlisle noticed a bulge in Defendant's pants pocket,  asked what it was, and patted Defendant down to make sure the bulge was not a weapon.  (Tr. 34).  Defendant pulled out a huge wad of cash wrapped in different colored rubber bands.  (Id.).

TFO Carlisle returned to his car and began to check their driver's licenses and

7

issue a Georgia State Patrol warning to the driver.[2]  (Tr. 35).  TFO Carlisle returned to the Maxima, gave Vera and Defendant their documents back, and issued Vera a courtesy warning ticket at 12:01 p.m.  (Tr. 35-36; Gov't's. Ex. 4).  Only eleven minutes passed between the beginning of the stop and the issuance of the courtesy warning ticket.  (Tr. 36).  In addition to the courtesy warning, because Vera was the driver of the Maxima, TFO also asked for consent to search and gave Vera a Consent to Search form printed in both English and Spanish.  (Tr. 37, 65; Gov't's Ex. 5, 6).  Although both Vera and Defendant spoke English fine and conversed easily with no problems, TFO Carlisle always provided people from the border with a consent form in English and Spanish because Spanish may be their native language.  (Tr. 37).  After Vera reviewed the consent forms, TFO Carlisle credibly testified that he told Vera to take his time, read the English or Spanish form, and to ask any questions he may have.  (Tr. 39).  Vera signed the English form and gave it back to TFO Carlisle within thirty to forty-five seconds. (Id.).  Because his computer only allows one name on a consent form, TFO Carlisle wrote Defendant's name on the Spanish form then walked around to the passenger side of the car, where Defendant was and asked for Defendant's signature.  (Id.).  While writing Defendant's name on the consent form and describing it to him, TFO credibly testified that Defendant said "search the car.  You can search the car."  (Id.).  Because

---

[2] TFO Carlisle did not ask for the registration for the vehicle because he was able to look up the registration after he wrote the warning ticket.  (Tr. 40).  Upon checking the vehicle registration of the red Nissan Maxima, Carlisle learned that it was registered to an individual with the last name "Finney."  (Id.).

8

AO 72A
(Rev.8/82)

TFO Carlisle already had Vera's signed consent to search and Defendant's verbal consent, TFO Carlisle did not present the form to Defendant. (Tr. 40).

After obtaining consent to search, TFO Carlisle proceeded to search the inside of the red Maxima. (Tr. 40). A broken cell phone and a Santa Muerta (a little statue) were the only things found inside the car. (Tr. 41). In the trunk of the vehicle, TFO Carlisle found a large roller bag and two smaller bags (one camouflage and one black). (Tr. 42; Gov't's Ex. 7). TFO Carlisle observed that the large roller bag was the same bag that the agents observed being transferred from the gray F-150 truck bearing the Texas license plate to the white Finney truck, albeit temporarily, then to the red Maxima. (Id.). When the roller bag was opened, TFO Carlisle observed what appeared to be bricks of cocaine or heroin packaged in shrink wrap and black electrical tape. (Tr. 43). To prevent any kind of flight or escape, at that point, Vera and the Defendant were placed in handcuffs. (Id.). One of the bricks was opened and field tested positive for cocaine. (Id.). TFO Carlisle pulled the roller bag out of the trunk, removed the bricks of cocaine, and put the bricks on the hood of the car to get an accurate count. (Id.). There were seventeen bricks or kilograms of cocaine in the roller bag. (Tr. 44). According to TFO Carlisle, when Defendant saw how many bricks [of cocaine] there were, Defendant freely and voluntarily blurted out, "They told me it was going to be ten." (Id.). TFO Carlisle also credibly testified that Defendant made other incriminating statements. (Tr. 44, 67).

At approximately 12:30 p.m., TFO Carlisle called Agent Matthew DeVane with

9

ICE to let him know what he found in the red Maxima. (Tr. 44, 70). Agent DeVane was part of the investigation team that was outside of the Red Roof Inn earlier that morning. (Tr. 70). Agent DeVane arrived at the scene of the stop at approximately 12:45 p.m. and found both Vera and Defendant handcuffed and standing on the side of the road. (Tr. 71). Agent DeVane moved Defendant's handcuffs to the front of his body and asked Defendant to sit in the front seat of TFO Carlisle's car. (Id.). Defendant was presented with an ICE statement of rights form. (Tr. 73). Defendant advised that he had completed high school and read and understood English. (Tr. 74). Defendant read the form aloud. (Id.). Before signing the form, Defendant asked Agent DeVane questions about immunity. (Tr. 76). Agent DeVane told Defendant he could not provide any promises, and explained that the United States Attorney's Office would be the only entity that could provide a promise or guarantee [of immunity]. (Id.). Agent DeVane told Defendant that if he wanted to speak to him, this was his opportunity to do so. (Tr. 76). Agent DeVane repeatedly told Defendant that Defendant's signature [waving his rights] on the statement of rights form was voluntary, and not to sign the form if he did not agree with everything on it. (Tr. 74). Defendant finished reading the form aloud and then signed it. (Tr. 74-75). Because TFO Carlisle had stepped away earlier to answer a question from another trooper and did not see Defendant sign the ICE statement of rights form, Agent DeVane asked Defendant in TFO Carlisle's presence, whether Defendant had just signed the form. (Id.). After Defendant affirmatively stated that he did in fact sign the form, TFO Carlisle also signed it. (Tr. 75). Agent DeVane also

signed and dated the and noted , "Read aloud, handcuffed in front of Carlisle's car." (Tr.

75).  Agent DeVane spoke to Defendant in a calm, peaceful, and matter of act demeanor.

(Tr. 77).  Defendant was calm, and no one not yelled at or threatened him.  (Id.).  After

waiving his rights, Defendant provided incriminating statements to Agent DeVane. (Tr.

78).

## II.   **LEGAL ANALYSIS**

Defendant argues TFO Carlisle did not have reasonable and articulable suspicion

of criminal activity when he conducted the traffic stop, detained Defendant, and

searched the vehicle in which Defendant was a passenger.  Defendant also argues TFO

Carlisle improperly extended the duration of the stop and illegally detained him based

on nothing more than a hunch.  Lastly, Defendant contends that his statements should

be suppressed because they were not freely and voluntarily made and were the product

of an illegal detention.  In response, the Government argues TFO Carlisle established

reasonable and articulable suspicion of illegal drug activity, authorizing him to stop the

vehicle to continue his investigation.  The Government further contends that Defendant

does not have standing to contest the seizure of items found in the red Maxima because

he was a passenger without ownership or a possessory interest in the vehicle.  Lastly, the

Government argues Defendant's statements should not be suppressed because

Defendant's custodial statements to Agent DeVane were given freely and voluntarily

after Defendant waived his Miranda warnings.  Because the undersigned finds that (1)

the traffic stop was a valid detention supported by personal observations of traffic

11

violations and reasonable suspicion of criminal activity; (2) Defendant's pre-arrest statements were outside the protection of Miranda; and (3) Defendant freely, knowingly, and voluntarily waived his custodial statements, Defendant's motion is due to be denied.

### A.  The Stop of the Red Nissan Maxima Was Justified by Reasonable Suspicion and TFO Carlise's Observation of Traffic Offenses

Defendant argues TFO Carlisle did not have reasonable and articulable suspicion of criminal activity to conduct the traffic stop. The Government argues in response that the evidence demonstrates that the traffic stop of the Maxima was justified by reasonable suspicion. This Court finds, under the facts of this case, that TFO Carlisle was authorized to conduct the traffic stop based on information known to him, together with his personal observations, because such information established reasonable and articulable suspicion of illegal drug activity.

The police may stop a car and briefly detain it and its occupants in order to investigate a reasonable suspicion that such persons are involved in criminal activity if the stop is reasonably related in scope to the circumstances which justified the stop. Terry v. Ohio, 392 U.S. 1 (1968); United States v. Spoerke, 568 F.3d 1236, 1248 (11th Cir. 2009); United States v. Acosta, 363 F.3d 1141, 1144-45 (11th Cir. 2004); United States v. Tapia, 912 F.2d 1367, 1370 (11th Cir. 1990). The police officer must "be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion" under the totality of the circumstances. United States v. Bautista-Silva, 567 F.3d 1266, 1272 (11th Cir. 2009); Tapia, 912 F.2d at 1370 (citing United States v. Sokolow, 490 U.S. 1 (1989)). Officers

12

are expected to use their experience and specialized training to draw inferences from the cumulative information available to them, including inferences that may evade untrained observers.  United States v. Bautista-Villanueva, 524 F. App'x 476, 478 (11th Cir. 2013).  The court "may not consider each fact only in isolation and reasonable suspicion may exist even if each fact 'alone is susceptible of innocent explanation'" and even if the suspicion ultimately turns out to be incorrect.  Bautista-Silva, 567 F.3d at 1272; Bautista-Villanueva, 524 F. App'x at 478.  "Such facts may be derived from 'various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers.'" United States v. Williams, 876 F.2d 1521, 1524 (11th Cir. 1989);  see also United States v. Jolly, 368 F. App'x 17, 19 (11th Cir. 2010) (per curiam) (unpublished) ("'the officer who makes the stop need not be the one who observed the suspicious activities if that information had been relayed to him.'") (quoting United States v. Powell, 222 F.3d 913, 918 (11th Cir. 2000)); United States v. Reed, No. 10-10397, 2010 WL 4146132, at*2 (11th Cir. Oct. 22, 2010) (per curiam) (unpublished) ( "the stopping officer is expected to assess the facts in light of his professional experience and where there is at least minimal communications between officers, we look to the collective knowledge of all officers in assessing this determination") (quoting United States v. Kreimes, 649 F.2d 1185, 1189 (5th Cir. July 1981).  It is the government's burden to demonstrate that the officer had an objective basis for the stop before initiating it.  See Welsh v. Wisconsin, 466 U.S. 740, 749-50 (1984); United States v. Tobin, 923 F.2d 1506, 1517 n.21, 1520

13

(11th Cir. 1991) (en banc) (Clark, J., dissenting).

In this case, the Government successfully carried its burden of demonstrating that TFO Carlisle had an objective basis for the stop before initiating it. Contrary to Defendant's argument, TFO Carlisle decision to stop, detain and search the red Maxima was based on more than a hunch. Under the totality of the circumstances, TFO Carlisle possessed reasonable suspicion to stop the red Maxima because it appeared as if drug-related activity may have been occurring and TFO Carlisle observed a number of traffic violations. Based on the behavior of the Vera and Defendant going from hotel to hotel, transferring the roller bag from one vehicle to another, changing vehicles, and engaging in heat checks, it was reasonable for law enforcement officers to believe that Defendant was engaged in criminal activity. The evidence revealed that TFO Carlisle, while conducting an investigation into illegal drug activity, had information that someone at or near the Red Roof Inn, a high crime area, was involved in illegal drug activity that possibly involved money going back to the border of Mexico. (Tr. 9-10). During surveillance of the parking lot at the Red Roof Inn, TFO Carlisle noticed a gray F-150 truck with a Texas license plate that was registered in Hildalgo, a city near the Mexico border. (Id.). TFO Carlisle's surveillance provided additional facts to the totality of suspicious circumstances. TFO Carlisle and other agents followed the F-150 truck and observed the driver, later identified as co-defendant Vera, engage in counter-surveillance maneuvers, referred to a "heat checks" to detect the presence of law enforcement. (Tr. 10-14). Defendant was followed to a second hotel, a Holiday Inn, where he was

14

observed going into the hotel carrying a small bag and returning to F-150 truck with a different bag, a roller bag similar to a suitcase. (Tr. 16). Adding to TFO Carlisle's suspicion of illegal drug activity was Defendant's interaction with two other vehicles, a white Finney truck and a red Nissan Maxima, and the repeated transfer of the roller bag. Officers conducting surveillance of Defendant at a body shop observed the roller bag being transferred from the gray F-150, to the white Finney pickup truck, then to the red Maxima. (Tr. 23-24). In light of the changing of vehicles and repeated transfer of the roller bag, it was reasonable for law enforcement officers to believe that the roller bag carried drugs, money, or other contraband.

Furthermore, co-defendant Vera's actions driving in tandem, traveling very close to the white pick up truck, and crossing several lanes also provided the officers with reasonable suspicion of illegal activity. After the roller bag was transferred to the red Maxima, the white Finny truck and the red Maxima left the body shop in tandem, traveling very, very close. At the entrance to Interstate 85, Vera now driving the red Maxima, made a sudden and dangerous maneuver to switch from the far right lane to the far left lane without using his turn signal. (Tr. 25-26). Vera's behavior in this regard is indicative of an effort to detect and avoid law enforcement surveillance. (Tr. 25-26). Additionally, the white Finney truck's behavior in swerving and attempting to cut between TFO Carlisle's vehicle and the red Maxima, provides a reasonable inference of an attempt to frustrate law enforcement surveillance. (28-29). Prior to the stop, TFO Carlisle activated his blue lights, flashing headlights, grille lights, fog lights, and siren

to signal Vera to pull over.  (Tr. 29).  Instead of pulling over immediately, Vera continued driving for a mile and a half to two miles.  (Tr. 30).  Based on the foregoing, including TFO Carlisle's observation of Vera committing several traffic violations, including following too close, speeding, failure to use his turn signal, and failure to yield to an emergency vehicle, TFO Carlisle had more than sufficient information to conduct a traffic stop.  Moreover, in light of the counter-surveillance measures undertaken by Vera and the white pick up truck, it was reasonable for the law enforcement officers to suspect that the red Maxima was carrying contraband.  See United States v. Gopie, 347 F. App'x 495, 498-500 (11th Cir. 2009) (Officers stop of Defendant's vehicle was justified by reasonable suspicion where, among other things,  agents observed drivers carrying wooden crates from a truck to a residence, two vehicles proceeded in tandem, then pulled up next to each other to conversed, split off, and one vehicle appeared to engage in counter-surveillance maneuvers.); see also United States v. Bryant, 334 F. App'x 259, 263 (11th Cir. 2009) (concluding that police officer's stop of car was justified by reasonable suspicion where police officer observed two vehicles abruptly depart after police officer approached and vehicles had been stopped in middle of road next to each other and pointing in opposite directions in area known for drug transactions); United States v. Nunez, 455 F.3d 1223, 1226 (11th Cir. 2006) (holding that detective possessed reasonable suspicion that contraband was removed from a residence to support stop of Mercedes and truck leaving residence because residence was believed to be a grow house, and law enforcement observed one individual carry a

16

black garbage bag out of the residence and place the garbage bag into the truck and a second defendant carry a cardboard box from the residence, place it into the Mercedes, and step into the Mercedes); Powell, 222 F.3d 913 at 918 (concluding that officers had reasonable suspicion that something related to drug trafficking occurred where defendant and her friend drove to house of known drug trafficker, defendant went into the garage with a backpack, defendant left with the backpack and returned to the passenger seat of car, the friend drove her through neighborhood, defendant returned to the house with the backpack, defendant left the backpack at the house after entering the garage, and defendant drove away in the car).

### B.    <u>Duration of the Detention</u>

Defendant argues after the traffic stop, TFO Carlisle improperly extended the duration of the stop and illegally detained hin resulting in an illegal search of the vehicle.  Contrary to Defendant's argument, the initial traffic stop was not unreasonably prolonged, and the subsequent detention was based on reasonable suspicion that Defendant was engaged in criminal conduct.

The legality of a detention following a traffic stop may be jeopardized if an officer improperly extends its duration. United States v. Hernandez, 418 F.3d 1206, 1209 n. 3 (11th Cir. 2005) (holding that in light of Muehler v. Mena, 544 U.S. 93, 100-01(2005), proper focus is on the duration, not the scope of questioning). An officer may prolong a stop: (1) to investigate the driver's license and the vehicle registration, including requesting a computer check; (2) while waiting for the results of a criminal history check

17

that is part of the officer's routine traffic investigation; (3) if the officer has "'articulable suspicion of other illegal activity'"; or (4) if the detainee consents.  United States v. Boyce, 351 F.3d 1102, 1106 & n.3 (11th Cir. 2003) (quoting United States v. Purcell, 236 F.3d 1274, 277-78 (11th Cir. 2001).  Thus, where the initial stop is legal, the officer has " 'the duty to investigate suspicious circumstances that then [come] to his attention.' " United States v. Harris, 928 F.2d 1113, 1117 (11th Cir. 1991) (quoting United States v. Hardy, 855 F.2d 753, 757 (11th Cir. 1988)).

Here, Defendant has not shown a Fourth Amendment violation.  First, only eleven minutes passed between the beginning of the traffic stop and the issuance of the warning.  (Tr. 36).  See Hernandez, 418 F.3d at 1212 n.7 (expressing "doubt that a [traffic stop] seizure of no more than seventeen minutes can ever be unconstitutional on account of its duration: the detention is too short").  Second, TFO Carlisle asked Vera for his driver's license and explained the reasons for the stop which were the traffic violations that TFO Carlisle personally observed.  (Tr. 31).  An officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation.  See U.S. v. Pruitt, 174 F.3d 1215 (11th Cir. 1999), citing United States v. Gonzalez-Lerma, 14 F.3d 1479, 1483 (10th Cir. 1994), cert. denied, 511 U.S. 1095 (1994).

Third, questions posed to Defendant unrelated to the stop were  not improper and did not prolong the stop.  Prior to writing the warning ticket, TFO Carlisle asked Vera, who the car belong to and who was riding with him.  (Tr. 32).  Vera did not know who

the car he was driving belonged to and did not know many facts about his passenger, the Defendant. (Id.). TFO also asked Defendant for identification, why was he in Atlanta, and what he did for work. (Tr. 31). Neither Vera nor Defendant knew the owner of the car, nor could either explain or provide a reason why they were in Atlanta, and Defendant stated he did not have a job. (Tr. 32-34). Thereafter, TFO Carlisle noticed a bulge in Defendant's pants pocket, and asked him what was it, and if he could pat him down to make sure it was not a weapon. (Tr. 35). Defendant pulled a wad of cash out of his pockets, and TFO Carlisle asked Defendant why he had so much cash on him. (Id.). Despite not having any source of income, Defendant responded the cash was for his expenses. (Id.). TFO Carlisle returned to his car to check both Defendant and Vera's licenses and issue a warning ticket. (Id.). Although TFO Carlisle's questions did not relate to the traffic violations, neither his questions nor Defendant's answers prolonged the duration of the stop. The Supreme Court recently held that "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop ... do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." Arizona v. Johnson, 555 U.S. 323, 333 (2009); see also United States v. Griffin, 696 F.3d 1354, 1362 (11th Cir. 2012) ( "[U]nrelated questions posed during a valid Terry stop do not create a Fourth Amendment problem unless they 'measurably extend the duration of the stop.'"). The same is true here. TFO Carlisle's unrelated questions did not take very long to ask or answer, and TFO Carlisle completed the warning citation form shortly after he asked

19

those questions.

Finally, although TFO Carlisle had reasonable suspicion of criminal activity when he stopped Defendant, TFO Carlisle was entitled to further detain Defendant and Vera after the traffic stop because Defendant and Vera's inconsistent responses also gave rise to reasonable suspicion of criminal activity.  Conflicting answers about where one is traveling to or from may give rise to a suspicion of drug activity because most drivers know the answers to these questions and because the driver may be trying to hide the fact that he is going to or coming from a known drug-source state.  See e.g., United States v. Williams, 271 F.3d 1262, 1270 (10th Cir. 2003); Pruitt, 174 F.3d at 1220; United States v. Wood, 106 F.3d 942, 947 (10th Cir. 1997); United States v. Harris, 928 F.2d 1113, 1117 (11th Cir. 1991).

In seeking to suppress physical evidence and statements obtained in this case, Defendant relies on United States v. Pruitt, 174 F.3d 1215 (11th Cir. 1999) and United States v. Perkins, 348 F.3d 965 (11th Cir. 2003).  Those cases, however, do not help Defendant because they are factually and legally distinguishable.

In Pruitt, the officer did not have reasonable suspicion of illegal activity when he questioned the occupants of a van, only evidence of speeding.  Pruitt, 174 F.3d at 1218, 1220-21.  There, unlike in this case, after being denied consent to search the van, the officer detained the occupants of the van for nearly one-half hour waiting for the arrival of a drug dog who sniffed the van and alerted to the presence of drugs.  Pruitt, 174 F.3d at 1218.  The van was then searched without a warrant.  (Id.).  Here, TFO Carlisle, in

20

addition to observing several traffic violations, had reasonable suspicion of illegal activity, the stop lasted only eleven minutes before a TFO Carlisle issued Vera a warning, and Vera provided his express consent to search.

For the same reasons, Defendant's reliance on <u>Perkins</u> is also misplaced.  In <u>Perkins</u>, after the warning ticket was issued, the officer had no reasonable suspicion to continue detaining the passenger and driver based solely on their nervousness and inconsistent statements.  <u>Perkins</u>, 348 F.3d at 970-71.  If anything, <u>Pruitt</u>[3] and <u>Jenkins</u> show how different this stop was in both duration (eleven minutes) and scope (as TFO Carlise already had reasonable suspicion of criminal activity and his questions did not prolong the stop).

Given all of the circumstances in the record and the limited, eleven minute duration of the stop before consent to search was provided by Vera, TFO Carlisle's questions, even though they may have been outside the scope of Vera's traffic violations did not unreasonably prolong the traffic stop.

**C.     Defendant Lacks Standing to Suppress the Search of the Red Maxima**

Defendant also argues physical evidence seized from the red Maxima should be

---

[3] It is also unclear whether <u>Pruitt</u> remains authoritative in the wake of the Supreme Court's decision in <u>Johnson</u>.  However, as discussed, <u>Johnson</u> makes clear that the Fourth Amendment does not limit the questions an officer conducting a traffic stop may ask absent a lengthening of the stop. 555 U.S. at 333. Nevertheless, because <u>Pruitt</u> is factually distinguishable, the Court need not decide the legal question of whether <u>Pruitt</u> has been overruled.

21

suppressed. The Government contends that Defendant lacks standing to suppress the search of the vehicle in which he was a passenger. This Court agrees.

A party seeking to challenge a search on Fourth Amendment grounds must establish that he has a legitimate expectation of privacy in the searched area. Rakas v. Illinois, 439 U.S. 128, 143-44 (1978). "A person has a legitimate expectation of privacy if (1) he has a subjective expectation of privacy, and (2) society is prepared to recognize that expectation as objectively reasonable." United States v. Harris, 526 F.3d 1334, 1338 (11th Cir. 2008), cert. denied, 555 U.S. 1014 (2008). "[A] passenger[ ] in a private car, . . . who has no possessory interest in the automobile, does not have a legitimate expectation of privacy in the interior of the automobile because he does not have the right to exclude others from the car." United States v. Lee, 586 F.3d 859, 864 (11th Cir. 2009), cert. denied, 559 U.S. 1100 (2010) (quotation omitted).

Applying the law to the facts of this case, Defendant failed to carry his burden of establishing standing to contest the search of the vehicle in which he was a passenger. Therefore, because it is undisputed that Defendant was merely a passenger in the red Maxima, did not know who was the owner of the vehicle, and did not own or rent the vehicle, Defendant cannot raise a Fourth Amendment challenge to the search of the red Maxima. See Lee, 586 F.3d at 864.

Furthermore, the undisputed evidence also shows that the search of the red Maxima occurred after its driver, Vera gave his express consent. TFO Carlisle credibly testified that after returning all of Vera's documents and issuing a traffic warning, he

22

asked Vera for consent to search the car. (Tr. 37-38, 64). Vera freely and voluntarily gave his written consent to TFO Carlisle to search the vehicle. (Tr. 28; Gov't Ex. 5 ). Although Defendant's consent was not needed, TFO Carlisle credibly testified that Defendant provided verbal consent to a search. Thus, under the totality of the circumstances, prior to searching the vehicle, TFO Carlisle obtained consent that was freely, knowingly, and voluntarily provided.

### D.   **Defendant's Statements Should Not Be Suppressed**

Defendant argues his pre-arrest statements to TFO Carlisle should be suppressed. Defendant also argues his post-arrest statements to Agent DeVane after he waived his <u>Miranda</u> rights should be suppressed because they were not freely, knowingly, and voluntarily provided.

### 1.   Defendant's Pre-Arrest Incriminating Statements Warnings Should Not Be Suppressed

To comport with the Fifth Amendment's prohibition against compelled self-incrimination, a person taken into custody must be advised of his right to remain silent and his right to counsel prior to an interrogation. <u>Miranda v. Arizona</u>, 384 U.S. 436, 478-79 (1966). <u>Miranda</u> only applies where "a person in custody is subjected to either express questioning or its functional equivalent." <u>Rhode Island v. Innis</u>, 446 U.S. 291, 300-01 (1980).

Ordinary traffic stops do not involve custody for purposes of <u>Miranda</u>, unless the stopped motorist is subjected to treatment during the traffic stop that amounts to a restriction of freedom to a degree associated with a formal arrest. <u>Berkemer v. McCarty</u>,

23

468 U.S. 420 (1984). In determining whether a defendant's freedom was curtailed "to a degree associated with formal arrest," the Court must consider the totality of the circumstances, including whether the officers brandished weapons or touched the defendant, whether the officers used a language or tone indicating that compliance with their orders could be compelled, and the location and length of the detention. United States v. Luna-Encinas, 603 F.3d 876, 881 (11th Cir. 2010).

In this case, there is no evidence in the record that TFO Carlisle restrained or curtailed either Defendant or Vera's freedom prior to finding the cocaine in the roller bag. When TFO Carlisle initially approached the red Maxima after the traffic stop, he first spoke to Vera, the driver. As previously discussed, TFO Carlisle then approached Defendant on the passenger side to ask him questions, such as where are you going and what do you do for work. Both Vera and Trevino were both seated in the vehicle and unrestrained. Additionally, Carlisle did not have any weapons drawn and did not yell or raise his voice. At this point, neither Vera nor Trevino were in custody. TFO Carlisle issued a traffic warning and not a citation, clearly indicating that neither were under arrest or in custody. See United States v. Street, 472 F.3d 1298, 1310 (11th Cir. 2006) (holding that Miranda warning are only required when there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest). Because Defendant was not in custody, Miranda warnings were unnecessary. Additionally, as earlier noted, even though the TFO Carlisle posed questions to Defendant and Vera that were unrelated to the traffic stop such as who owned the car

24

they were riding in, where they were going, and where they worked, TFO Carlisle's questions were legally proper because the questions did not unreasonably prolong the traffic stop.

   2. <u>Defendant's Spontaneous Statements Should Not Be Suppressed</u>

  "Voluntary and spontaneous comments by an accused . . . are admissible evidence if the comments were not made in response to government questioning." <u>United States v. Sanders</u>, 315 F. App'x 819, 823 (11th Cir. 2009) (quoting <u>Cannady v. Dugger</u>, 931 F.2d 752, 754 (11th Cir. 1991)); <u>see also</u> <u>Miranda</u>, 384 U.S. at 478 ("Volunteered statements of any kind are not barred by the Fifth Amendment . . . .").

  In this case, Defendant's pre-<u>Miranda</u>, post-arrest statements uttered after TFO Carlisle performed a consent search of the roller bag should not be suppressed.  After TFO Carlisle observed and then counted seventeen bricks of cocaine in the roller bag, to prevent either Vera or Defendant from any kind of flight or escape, TFO Carlisle placed them in handcuffs.  (Tr. 43).  After field testing a brick of cocaine and getting a positive result, TFO Carlisle pulled the bag out of the trunk of the car, removed the bricks of cocaine, and placed them on the hood of the car to get an accurate count.  (<u>Id.</u>).  TFO Carlise credibly testified that when Defendant saw how many bricks of cocaine were in the bag, Defendant blurted out "they told me it was going to be ten."  (Tr. 44,67).  Prior to Defendant's spontaneous statement, TFO Carlisle did not initiate the conversation while searching the bag or ask Defendant any questions about the drugs that he found.

25

Thus, under the circumstances, this Court concludes that statements Defendant uttered to TFO Carlisle, without any prompting from any officer, were spontaneous and not the result of interrogation or the functional equivalent of interrogation. Consequently, these statements are admissible, even absent any Miranda warnings. See United States v. Jules, 244 F. App'x 964, 972 (11th Cir. 2007) (providing that "the absence of Miranda warnings would not preclude the admission of a spontaneous statement"); Cannady, 931 F.2d at 754 ("Voluntary and spontaneous comments by an accused, even after Miranda rights are asserted, are admissible evidence if the comments were not made in response to government questioning"); United States v. Glen-Archila, 677 F.2d 809, 814-15 (11th Cir. 1982) (upholding district court's finding that spontaneous, volunteered statements were admissible despite absence of Miranda warnings); United States v. Savell, 546 F.2d 43, 45-46 (5th Cir. 1977)[4] (concluding that Miranda does not apply "where the statements were unsolicited, spontaneous and freely made prior to any attempted interrogation"). Because Defendant volunteered statements, his statements are not barred by the Fifth Amendment and their admissibility is not affected by Miranda. See Miranda, 384 U.S. at 478.

3.     Defendant Freely and Voluntarily Waived His Miranda Rights

Defendant argues his statements to Agent DeVane were not made voluntarily after a knowing waiver of his Miranda rights. Defendant also argues his statements were the

---

[4] In Bonner v. City of Pritchard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent, all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

fruit of the poisonous tree, stemming from his illegal detention.  Having found that TFO Carlisle legitimately conducted a traffic stop based on Vera's violation of traffic laws and reasonable suspicion of criminal activity, the Court need not address whether Defendant's statements were the fruit of the poisonous tree.  Instead, this Court will address whether Defendant waiver of his Miranda rights were made freely, knowingly, and voluntarily.

In this case, Defendant freely waived his Miranda rights and made statements with full knowledge of the rights he was waiving.  First, when Defendant waived his rights, he was aware of the nature of the rights being abandoned and the consequences of the decision to abandon it.  Here, the record is clear that Defendant was advised of his Miranda rights by Agent DeVane who credibly testified that before questioning Defendant, he moved Defendant's handcuffs to the front of his body, asked him to sit in the front passenger seat of TFO Carlisle's car, and presented Defendant with a statement of rights form.  (Tr.73).  Defendant was fully apprized of his rights before the interrogation started.  Agent DeVane also credibly testified that Defendant, who has a high school education and can read and understand the English language, read the ICE statement of rights form aloud.  (Tr. 74-76).  Thus, this Court concludes that Defendant had the capacity to understand his rights, and he understood his rights.

Moreover, the circumstances of the investigation were not coercive.  Defendant was not being ordered to do anything, he  understood he was waiving his rights, and he even asked questions about immunity before signing the ICE statement of rights form.

27

(Tr. 76). After reading his <u>Miranda</u> warnings, Defendant signed an ICE statement of rights form prior to inculpating himself. (Tr. 74-74; Gov't Ex. 8). Furthermore, Defendant stated in TFO Carlisle's presence that he signed the ICE statement of rights form. (Tr. 75).

Finally, Defendant argues Agent DeVane knew he had no authority to discuss the possibility of immunity, and the fact that Agent DeVane gave a vague response to Defendant and told him he could not make any promises, but would let the U.S. Attorney's Office know Defendant's level of cooperation gave Defendant the misperception that the only way to get immunity was to give a statement to Agent DeVane. This Court finds Defendant's argument to be without merit for a number of reasons. First, it was Defendant and not Agent DeVane who raised the issue of immunity. Second, Agent DeVane was simply responding to Defendant's questions regarding immunity and explained to Defendant that the United States Attorney's Office would be the only entity that could provide a promise or guarantee [of immunity]. (Tr. 76). Third, Agent DeVane did not provide any promises as to what a prosecutor might do based on Defendant's statements or answers, and no one played tricks on him. Instead, Agent DeVane told Defendant that if he wanted to speak to him, this was his opportunity to do so. (Tr. 76). Fourth, Agent DeVane repeatedly told Defendant that Defendant's signature indicating that he waived his rights on the statement of rights form was voluntary, and not to sign it if he did not agree with everything. (Tr. 74). After asking a few more questions about the sentencing guidelines, Defendant freely and

28

voluntarily executed the statement of rights form, and proceeded to provide incriminating statements to Defendant.  Under the totality of the circumstances, this Court concludes that Defendant knowingly, intelligently, and voluntarily waived his <u>Miranda</u> rights and provided statements to Agent DeVane.

<u>**CONCLUSION**</u>

Based on the foregoing, Defendant's Motions to Suppress Physical Evidence and Statements should be **DENIED**.  Docket Entry [75].  As there are no further motions pending, the undersigned certifies this case ready for trial.  The Clerk is directed to terminate the reference to the undersigned.

**SO ORDERED, REPORTED AND RECOMMENDED** this <u>2nd</u> day of February, 2015.

s/LINDA T. WALKER
LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE

29

AO 72A
(Rev.8/82)